Wilkes-Barre Council of Newspaper Unions, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Office of Employment Security, Department of Labor and Industry, Respondent.

Argued February 4, 1981, before President Judge CRUMLISH and Judges WILKINSON, JR.,MENCER, BLATT, MACPHAIL, WILLIAMS, JR. and PALLADINO. Judges ROGERS and CRAIG did not participate.

*Warren J. Borish, Meranze, Katz, Spear & Wilderman,* for petitioner.

*Sean F. Creegan,* Assistant Attorney General, for respondent.

OPINION BY JUDGE MACPHAIL, March 19, 1981:

Wilkes-Barre Council of Newspaper Unions, Inc. (Council) appeals from an order of the Office of Employment Security, Department of Labor and Industry (Office) which denied a petition for reassessment under Section 304(a) of the Unemployment Compensation Law (Law).[1]

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §751 *et seq.*

Section 304 reads in pertinent part as follows:

Each employer shall file with the department such reports, at such times, and containing such information, as the department shall require, for the purpose of ascertaining and paying the contributions required by this act.

(a) If any employer fails within the time prescribed by the department to file any report necessary to enable

The facts of this case are essentially uncontested. The Council is a Pennsylvania, non-profit corporation comprised of four Wilkes-Barre labor unions,[2] which was formed just prior to the anticipated strike of these unions against the Wilkes-Barre Publishing Company (Employer). The express purpose of the Council was to publish an interim newspaper, the "Citizens Voice" ("Voice") as a strike weapon until an acceptable contract could be negotiated with the Employer. The strike began on October 6, 1978. The first edition of the "Voice" was published on October 9, 1978 and continued on a daily basis. At the time of the hearing before the Office, the strike had not been settled and the "Voice" was still being published.

During the strike the unions assigned their members to various strike related activities. Some of the members operated a strike kitchen, others picketed the Employer, while still others performed janitorial services at the unions' headquarters. The majority of the members were assigned to publish the "Voice." A week after the strike began, members of three of the four unions began to receive strike benefits from their parent International Unions. On November 17, 1978, members of all four unions began to receive sup-

---

the department to determine the amount of any contribution owing by such employer, the department may make an assessment of contributions against such employer of such amount of contributions for which the department believes such employer to be liable....

If such employer is dissatisfied with the assessment so made he may petition the department for re-assessment....

....

43 P.S. §784.

[2] Newspaper Guild of Wilkes-Barre, Local 120.
Wilkes-Barre Typographical Union, Local 187.
Wilkes-Barre Printing, Pressman and Assistants Union, Local 137.
Wilkes-Barre Stereotypers and Electrotypers Union, Local 139.

plemental strike benefits from the profits of the "Voice." The amount paid from the profits to the union members varied so as to ensure that each and every union member received the same total amount of strike benefits per week.

To supplement the services of the union members on the "Voice" the Council hired some non-union employees. The Council covered these employees with Workmen's Compensation Insurance, withheld income taxes from their wages and contributed to the Unemployment Compensation Fund (Fund) according to the amount paid to these workers. The Council, however, did not cover the union members with Workmen's Compensation Insurance, withhold any personal income taxes from the supplemental strike benefits nor make any contribution to the Fund based on the supplemental strike benefits.

On August 27, 1979 the Council was notified that the Office[3] had made a determination and assessment against the Council for money owed to the Fund. A hearing was held on October 17, 1979. The hearing examiner held that the Council was the employer of the union members and that the money from the "Voice" paid to the union members who worked on the newspaper were wages for purpose of contribution to the Fund, while the money from the "Voice" paid to union members who did not work for the "Voice" were not. The Council appealed to this Court.

Our scope of review of a decision by a Commonwealth agency is to determine whether there has been an error of law or whether any finding of fact necessary to support its adjudication is not supported by substantial evidence. Administrative Agency Law, 2 Pa. C. S. §704.

---

[3] The Bureau of Employer Tax Operations, Accounting Division is responsible for making the assessments.

The Council argues that the Office erred in holding that the relationship between the Council and the union members assisting in the publication of the "Voice" was an employer-employee one within the meaning of the Law. The Council further argues that the money received by the union members from the profits of the "Voice" are supplemental strike benefits and are not wages under the Law. We will consider the latter issue first.

Provisions of a statute imposing taxes are to be strictly construed. Statutory Construction Act of 1972, 1 Pa. C. S. §1928.

Definitions are found in Section 4 of the Law. In pertinent part the relevant ones are as follows:

> ....
> (i) 'Employe' means every individual ... who ... has performed services for an employer in an employment subject to this act.
>
> (j)(1) 'Employer means every [one] ... who employs any employe in employment subject to this act....
>
> ....
> (l)(1) 'Employment' means all personal service performed for remuneration by an individual under any contract of hire, express or implied, written or oral....
>
> ....
> (x) 'wages' means all remuneration ... paid by an employer to an individual with respect to his employment....

43 P.S. §753.

Applying these definitions to the second issue, the question now becomes, "was the money received from the 'Voice's' profits by the union members who worked on the 'Voice' remuneration for personal services performed for the Council?" For the reasons given below we hold that it was not.

It is well known that one of the purposes of a union is the ability of the collective body to exert greater economic pressure against an employer than could be exerted by individuals each acting on their own. The tactics used by unions are as varied as the circumstances of the particular strike. Formation of an interim business competitor or substitute are just two weapons in the wide assortment of weapons in the union's arsenal.[4]

It has also been long recognized that an accumulation of a reasonably necessary strike fund is a proper objective of a labor organization. Strike benefits are distributed from the fund in furtherance of union objectives.

The Law provides that any service deemed to be employment and any remuneration determined to be wages for which taxes must be paid under Federal law, will also be taxed under the Law. Section 4(a)(6) and (x)(6), 43 P.S. §753(1)(6) and (x)(6). The question of whether union strike benefits constitute wages for Federal Unemployment Compensation Act (FUTA) purposes has been considered several times by the Internal Revenue Service (IRS). In Revenue Ruling 68-424, 1968-2 C.B. 419, the constitution of the union provided that in order to receive strike benefits its members were required to report every day to strike headquarters for assignments. Although not all of the members were assigned duties every day, all who

---

[4] The United States Supreme Court in *National Labor Relations Board v. Insurance Agents' International Union*, 361 U.S. 477 (1960), stated that "Congress has been rather specific when it comes to outlaw particular economic weapons on the part of unions." *Id.* at 498. The court further stated that there must be good-faith collective bargaining and that the NLRB was not to create lists of acceptable and unacceptable behavior. If unfair labor practices were alleged by either party, each case was to be examined on its own facts.

reported were paid strike benefits. The IRS stated that the benefits were paid in accordance with the union constitution, by reason of their affiliation with the union and not as remuneration for services performed by an employee for his employer. The IRS added that this conclusion was supported by the fact that the strike benefits had been paid to all in a fixed amount, irrespective of the value of any services that were performed.

The revenue ruling clearly applies to the case at bar. The benefits were paid to the members by reason of their affiliation with the union. The amount paid from the "Voice's" profits varied only with relationship to the basic strike benefits paid by three of the four unions. All persons received the same total amount of money each week regardless of the value of the services performed.

The Council asserts that the hearing examiner's finding of fact number 5 "that the worker is docked benefits on a daily basis if he fails to perform such a service," is not supported by substantial evidence. We agree. The record clearly shows that the International Unions require local unions to deny strike benefits to those members who *refuse* to participate in the strike activities. Consequently, the Council did not pay supplemental benefits to any member who *refused* to participate. All other members were paid, even if they were unable to work because of disability or illness.

The Office urges us to apply in the instant case, Revenue Ruling 75-475, 1975-2 C.B. 406 in which payments made to members by the union were found to be wages for FUTA purposes. In that ruling the union members were required to report to the union hall daily. Only those who actually received an assignment and performed services were paid. Payment was computed at an hourly rate and on a forty hour week. The union reduced the maximum work payment by

the number of hours the member failed to perform services or had no service to perform.

The facts in the instant case are readily distinguished from those in Ruling 75-475. The record shows that equal payments were made to all members regardless of the number of hours the member performed services. Payments were made to those members who were disabled or unable to perform services. The only members who did not get paid were those who *refused* to perform any service.

Further, an across the board payment to all members regardless of the service performed, the education and experience of the member, or the amount of hours served does not comport with the normal understanding of "wages." Under the facts of the instant case, a person who had worked ten years for the Employer received the same amount of money as one who had worked only a few weeks before the strike began. The amount of payment received from the Council was commensurate not with the services performed, but rather with the strike benefit provided by the International Union to which the recipient belonged.

It is also important to note that in November, 1980, the Department of Revenue held that the supplemental strike benefits were not wages under the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §7101 *et seq.* and that the Council was not required to withhold personal income taxes from the payments. While this decision does not control the result in the case at bar, it is certainly very persuasive and supports our finding that the payments from the "Voice's" profits are strike benefits and not wages under the Law.

The referee in his decision stated that "it has been the general practice so far as Pennsylvania is concerned to exempt strike benefits from the definition of

wages." He further noted that the Office did not and does not construe the amounts of benefits supplied by the general strike funding of the Internationals as anything other than non-taxable strike benefits.

In a letter from the Office's Accounting Division to the Council, the Office stated that

> Strike benefits paid by a union to its members from a fund established for such a purpose, are not wages for Pennsylvania Unemployment Compensation purposes, unless the receipt of such payments is conditioned upon the performance of specific services for the Union.

It is important to note, however, that the International Union provides benefits to their striking members *only* if those striking members perform some strike related activity which is coordinated, controlled and directed by the local unions. Under the circumstances of this case, the Office cannot, therefore, argue that strike benefits received by members assigned to one recognized strike related activity is exempt from taxation under the Law, while strike benefits received by members assigned to another recognized strike related activity is not exempt just because the latter activity happens to supplement the strike benefit fund. Since strike benefits have been held to be excluded for purposes of taxation under the Law, we find the Council is not required to contribute to the Fund for these payments.

Because we hold that the money paid to union members was a strike benefit and not wages, we do not reach the issue of whether an employer-employe relationship exists between the Council and the union members.

Accordingly, we reverse the order of the Bureau of Employment Security.

10

AND Now, this 19th day of March, 1981, the order of the Office of Employment Security dated March 25, 1980, denying the Petition for Reassessment filed by the Wilkes-Barre Council of Newspaper Unions is hereby reversed and this case is remanded for further action consistent with this opinion.