Chief Justice FLAHERTY and Justice SAYLOR dissent.

**Branes N. SOUTHARD and Deborah Southard, Husband and Wife, Appellants,**

v.

**TEMPLE UNIVERSITY HOSPITAL, David H. Clements, III, M.D., and William F. Young, M.D., Appellees.**

Superior Court of Pennsylvania.

Argued Feb. 24, 1998.

Filed April 27, 1999.

Reargument Denied July 7, 1999.

---

**3.** The extensive character testimony provided on Verlin's behalf demonstrates the high regard and reputation that he enjoyed during the thirty-five years that he practiced law in the Philadelphia area. That Verlin had such a distinguished career and was held in such high esteem by his colleagues and the community at large suggests that the serious misconduct which resulted in his disbarment was an aberration.

John P. Kopesky, Philadelphia, for appellants.

J. Kurt Straub, Philadelphia, for appellees.

Mark W. Tanner, Philadelphia, amicus curiae.

Before McEWEN, President Judge, MUSMANNO and BROSKY, JJ.

MUSMANNO, J.:

¶ 1 Appellants Branes N. Southard ("Branes Southard") and Deborah Southard ("Deborah Southard" and, together with Branes Southard, "Southards")[1] appeal from a judgment entered in favor of Appellees Temple University Hospital ("Temple"), David H. Clements, III, M.D. ("Clements"), and William F. Young, M.D. ("Young" and, together with Clements, "Physicians") in this medical malpractice action.[2] We affirm in part, vacate in part, and remand for a new trial.

¶ 2 The relevant facts of this case are as follows. In October 1992, at Temple, Clements, a neurosurgeon, and Young, an orthopedic surgeon, performed spinal fusion surgery upon Branes Southard to alleviate his severe back pain. During the surgery, Physicians implanted into the pedicles of Branes Southard's spine orthopedic bone rods and screws ("bone screws" or "screws") to aid in the fusion process.[3]

¶ 3 Bone screws, if intended for use in the spine, are classified by the United States Food and Drug Administration ("FDA") as a Class III device pursuant to the Medical Device Amendments to the Food, Drug, and Cosmetic Act ("Medical Device Amendments").[4] A Class III classification means that the FDA has determined that manufacturers have not provided sufficient information to provide reasonable assurance of the safety and effectiveness of bone screws for use in the spine. Therefore, manufacturers cannot market, label or promote bone screws for commercial distribution or sale for use in the spine unless they obtain premarket approval from the FDA.[5] 21 U.S.C. § 360e; 21 C.F.R. Part 814.

¶ 4 Manufacturers of bone screws are permitted, however, to investigate the safety and effectiveness of bone screws for use in the spine, but only in FDA-monitored clinical investigations. See 21 U.S.C. § 360j(g); 21 C.F.R. Part 812. In such clinical investigations, qualified experts conducting the investigations are required to follow procedures and abide by conditions mandated by the FDA, including informing patients who are subjects of the investigations about the experimental na-

1. Plaintiffs' Legal Committee for the Orthopedic Bone Screw Products Liability Litigation MDL No. 1014 and Plaintiffs' Liaison Counsel for the Pennsylvania Orthopedic Bone Screw Litigation together have filed an Amicus Brief in support of Southards.

2. Pennsylvania Medical Society and Donald L. Myers, M.D. together have filed an Amicus Curiae Brief in support of Temple and Physicians.

3. The bone screws at issue in this case were manufactured by Danek Medical, Inc. and are known as TSRH Spinal System Implants. Other manufacturers have produced different bone screw systems, but the bone screws used in those systems are similar to the TSRH screws for all purposes relevant to this Opinion. Thus, we will refer to the TSRH screws and to bone screws produced by other manufacturers interchangeably in this Opinion.

4. In the Medical Device Amendments and their corresponding regulations, Congress has established a scheme by which the FDA regulates the marketing, labeling, and promoting of medical devices for commercial distribu-

tion or sale by the manufacturers of those devices. See 21 U.S.C. §§ 351–360ss; 21 C.F.R. Parts 800–898. Pursuant to that scheme, medical devices are classified by the FDA into the following categories depending on, inter alia, the regulatory controls deemed necessary to provide reasonable assurance of their safety and effectiveness prior to commercial distribution or sale: (1) Class I, for which the FDA requires "general controls," e.g., a manufacturer must meet certain registration and recordkeeping requirements; (2) Class II, for which the FDA requires "special controls," e.g., a manufacturer must comply with performance standards and maintain patient registries; and (3) Class III, for which the FDA requires "premarket approval," e.g., a manufacturer must complete a rigorous application process and receive FDA approval prior to commercial distribution or sale. 21 U.S.C. § 360c(a)(1)(A)–(C); 21 C.F.R. Part 860.

5. At the time of Branes Southard's surgery, no manufacturer of bone screws had attained premarket approval from the FDA to distribute or sell commercially bone screws for use in the spine.

ture of the screws. 21 U.S.C. § 360j(g)(3)(D); 21 C.F.R. Part 50.

¶ 5 Manufacturers are permitted to market, label and promote bone screws for commercial distribution or sale if they are intended for use in long bones (such as a tibia or a femur) rather than in the spine. If used in long bones, bone screws are classified by the FDA as a Class II device, meaning that the FDA has determined that, for that intended use only, there is sufficient information to provide reasonable assurance that bone screws are safe and effective.

¶ 6 The manufacturer of the bone screws that were implanted into Branes Southard's spine provided FDA-approved literature in the screws' packaging. That literature indicated that bone screws, in most cases, eventually must be explanted because, otherwise, a variety of complications could occur.

¶ 7 Neither Temple nor Physicians informed Branes Southard, prior to his surgery, that bones screws had been classified by the FDA as a Class III device for use in the spine and, therefore, that the FDA had not approved them as safe and effective. Nor did Temple or Physicians inform Branes Southard before the surgery that the bone screws eventually would need to be explanted. In May 1994, Branes Southard underwent surgery to explant the bone screws.

¶ 8 In June 1995, Southards filed a Complaint against Temple and Physicians[6] asserting, *inter alia*, that Temple and Physicians were negligent in performing Branes Southard's spinal fusion surgery. Southards claimed that Physicians were negligent in their decision to perform the spinal fusion surgery when a laminectomy

would have sufficed and that Temple was vicariously liable therefor as the employer of Physicians. Southards also asserted claims against Temple and Physicians based on their failure to obtain Branes Southard's informed consent prior to the surgery. Southards argued that Temple and Physicians did not advise Branes Southard that the FDA had classified bone screws as a Class III device if used in the spine. Also, Southards contended that Temple and Physicians failed to inform Branes Southard that the bone screws might loosen or require explantation as stated in the manufacturer's literature. Deborah Southard asserted claims of loss of consortium against Temple and Physicians.

¶ 9 Southards' case became part of Pennsylvania's coordinated orthopedic bone screw litigation in the Court of Common Pleas of Philadelphia County. *See In re: Orthopedic Bone Screw Litigation*, No. 0002, August Term, 1994 (C.C.P. Philadelphia).[7] Similar coordinated litigation is ongoing in the United States District Court for the Eastern District of Pennsylvania. *See In re: Orthopedic Bone Screw Products Liability Litigation*, MDL Docket No. 1014 (E.D.Pa.).[8]

¶ 10 In August 1995, certain physicians, who were defendants in other cases that were part of either the federal or state coordinated orthopedic bone screw litigations, moved for partial summary judgment in those cases claiming that they were not required under the doctrine of informed consent to inform their patients of the FDA classification of bone screws used in the spine. In a Memorandum and Order issued jointly by the courts in both the federal and state coordinated litiga-

6. Also named as Defendants in the Complaint were Danek Medical, Inc., the manufacturer of the bone screws implanted into Branes Southard, and Christopher Getch, M.D., a surgeon who assisted in the surgery. Both were dismissed voluntarily from the case.

7. All pending state actions alleging personal injuries resulting from the use of bone screws in spinal fusion surgery were coordinated pursuant to court Order.

8. All pending federal actions alleging personal injuries resulting from the use of bone screws in spinal fusion surgery were coordinated pursuant to court Order.

tions and made applicable to all cases that were a part thereof, the courts granted partial summary judgment to the physicians as to that issue. The courts therefore dismissed with prejudice all claims in the coordinated litigations alleging that physicians are required under the doctrine of informed consent to disclose to patients the FDA classification of bone screws used in the spine. *See* Memorandum and Order, 3/8/96, at 11.

¶ 11 Additionally, certain hospitals, who were defendants in the state coordinated orthopedic bone screw litigation, also moved for partial summary judgment contending that they were not liable under any doctrine of informed consent because only physicians, and not hospitals, are responsible for obtaining informed consent. In an Order applicable to all cases that were a part of the state coordinated litigation, the trial court granted partial summary judgment to the hospitals as to that issue, thereby dismissing with prejudice all claims in that litigation alleging that hospitals are liable based on informed consent theories. *See* Order dated 4/16/96.

¶ 12 Southards' jury trial commenced as to the negligence claims against Temple and Physicians and as to the one surviving informed consent claim against Physicians based on a failure to advise Branes Southard of the possibility that the bone screws might loosen or need explantation. At trial, Physicians and their expert testified that the risks of the bone screws loosening or needing explantation were so remote that it was not necessary to inform Branes Southard of those risks. They also testified that they did not read the manufacturer's literature concerning the bone screws. The trial court refused to allow Southards to cross-examine Clements regarding the contents of the manufacturer's literature, including the statements therein regarding the need for explantation.

¶ 13 At the conclusion of trial, the jury returned a verdict in favor of Temple and Physicians as to the negligence claims and in favor of Physicians as to the informed consent claim. Southards filed a post-trial Motion, which the trial court denied. Judgment was entered in favor of Temple and Physicians. Southards then filed this timely appeal.

¶ 14 On appeal, Southards contend that trial court erred as follows:

(1) by granting partial summary judgment in favor of all physicians regarding informed consent claims based on a failure to inform patients of the FDA classification of bone screws;

(2) by granting partial summary judgment in favor of all hospitals regarding all informed consent claims;

(3) by prohibiting cross-examination of Clements regarding the contents of the manufacturer's literature indicating the need for explantation of bone screws;

(4) by failing to instruct the jury that proof of causation is not required to prove damages in an informed consent claim;

(5) by failing to instruct the jury that Physicians' failure to read available information about the risks of bone screws and consequent failure to inform Branes Southard of those risks could establish Physicians' failure to obtain Branes Southard's informed consent; and

(6) by failing to instruct the jury that Physicians could have breached the standard of care by not educating themselves as to the proper use of bone screws and by not investigating the screws' side effects.

¶ 15 In their first two issues on appeal, Southards challenge the granting of summary judgment in favor of Temple and Physicians. In reviewing a grant of summary judgment, our scope of review is plenary. *Albright v. Abington Mem. Hosp.*, 548 Pa. 268, 280, 696 A.2d 1159, 1165 (1997). We apply the same legal standard for the granting of summary judgment as the trial court:

A grant of summary judgment is proper [when] "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the presence of a genuine issue of material fact must be resolved against the moving party.

*Id.* at 280, 696 A.2d at 1165 (citations omitted); *see also* Pa.R.C.P. 1035.1–1035.5.

¶ 16 Southards first argue that the courts in the coordinated litigations erred by determining that, as a matter of law, a physician is not required to disclose the FDA's classification of bone screws to a patient prior to implantation of the screws in order to obtain that patient's informed consent. Southards request a new trial in which a jury is permitted to decide if Physicians' failure to advise Branes Southard of the FDA's classification of bone screws violated Pennsylvania's doctrine of informed consent.

¶ 17 Pennsylvania law requires a physician, in a non-emergency situation, to obtain a patient's informed consent prior to performing a surgical procedure if the patient is mentally and physically able to discuss his or her medical condition. *Doe v. Dyer–Goode*, 389 Pa.Super. 151, 566 A.2d 889, 891 (1989). Pennsylvania's informed consent doctrine is based on a "prudent patient" standard and courts, therefore, must examine informed consent issues from the perspective of the patient, not of the physician. *Sagala v. Tavares*,

367 Pa.Super. 573, 533 A.2d 165, 167 (1987). Thus, for a patient's consent to be informed, a physician must disclose to the patient the "material facts, risks, complications and alternatives to surgery, which a reasonable man in the patient's position would have considered significant in deciding whether to have the operation." *Gouse v. Cassel*, 532 Pa. 197, 202, 615 A.2d 331, 333 (1992).[9] Generally, it is the finder of fact who determines whether information is material in an informed consent action. *Moure v. Raeuchle*, 529 Pa. 394, 405, 604 A.2d 1003, 1008 (1992).

¶ 18 In addressing the issue of whether Pennsylvania's doctrine of informed consent requires physicians to inform their patients of the FDA's classification of bone screws, the courts in the coordinated litigations emphasized the fact that the FDA regulates only manufacturers in marketing, labeling and promoting medical devices for commercial sale and does not regulate the "practice of medicine."[10] On the basis of that premise, the courts stated that the FDA classification of a medical device is not a "risk" of a surgical procedure because that classification does "not speak directly to the medical issues surrounding a particular surgery" and is only an "administrative or regulatory" label. Memorandum and Order, 3/8/96, at 8, 11; *see also* Trial Court Opinion, 7/29/97, at 4 (holding that the FDA's classifications of medical devices do not constitute "complications or risks of surgery," "alternative methods of treatment," or "facts which a reasonable patient would consider material in deciding to undergo surgery"). The courts concluded, therefore, that a physician never need disclose

---

9. We note that, at the time of Branes Southard's surgery, Pennsylvania's Health Care Services Malpractice Act defined "informed consent" as follows:

"Informed consent" means ... the consent of a patient to the performance of health care services by a physician ... [p]rovided ... [t]hat[,] prior to the consent having been given, the physician ... has informed the patient of the nature of the proposed

procedure or treatment and of those risks and alternatives to treatment or diagnosis that a reasonable patient would consider material to the decision whether or not to undergo treatment or diagnosis.

40 P.S. § 1301.103 (amended 1996).

10. Temple, Physicians, and their supporting Amici also place great emphasis on that fact in this appeal.

the FDA classification of a medical device to a patient to obtain that patient's informed consent.

¶ 19 We disagree. The emphasis that the courts place upon their premise regarding the "practice of medicine," as well as the relevance that they assign thereto, is misplaced. Similarly, the courts' determination that an FDA medical device classification is neither a "risk" of nor germane to a surgical procedure is incorrect. For these reasons, which we expound in what follows, we conclude that the courts in the coordinated litigations erred in ruling as a matter of law that physicians need not inform patients of the FDA's classification of bone screws.

■ ¶ 20 Initially, with respect to the premise underlying the courts' partial summary judgment ruling, and the position of Temple, Physicians, and their supporting Amici in this appeal, we do not dispute the fact that the FDA does not regulate the practice of medicine. Indeed, as is clearly stated both in the Medical Device Amendments and in numerous statements and notices issued by the FDA, a physician, using his best medical judgment for the benefit of his patient, generally is free to use a medical device in a manner different from that for which the FDA has approved the device for commercial sale, *i.e.,* an "off-label" use. *See* 21 U.S.C. § 396 ("Nothing in [the Medical Device Amendments] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate healthcare practitioner-patient relationship."); Use of Approved Drugs for Unlabeled Indications, 12 FDA Drug Bulletin 4–5 (1982) ("Once a product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling.");

Letter from Diane Thompson, Associate Commissioner for Legislative Affairs, Food and Drug Administration, to Honorable Joseph Barton, Chairman, Subcommittee on Oversight and Investigation, Committee on Commerce, House of Representatives (1995) ("FDA does not view its mission to include regulation of the practice of medicine. FDA's responsibility is the market introduction of new medical products for particular uses.").[11]

¶ 21 Moreover, we agree with Temple, Physicians, and their supporting Amici that there are good reasons, recognized by the FDA, that the FDA does not regulate a physician's use of a medical device. A patient may present to a physician with a unique medical problem such that the patient's best interests would be served by use of a device in a new and innovative manner. If a physician were required first to obtain FDA approval of a device for that new use, because of the often lengthy and expensive FDA-approval process, a patient could be denied a possibly beneficial treatment alternative and the advancement of medical science could be delayed or impeded. *See* 12 FDA Drug Bulletin at 4–5.

¶ 22 Additionally, we recognize that physicians may use a device in a manner not yet approved for commercial sale by the FDA, but so extensively as to be amply reported in medical literature and so successfully as to have become the standard of care in the medical community. *Id.* Indeed, the FDA itself acknowledged in 1995 that the use of bone screws in the pedicles of the spine is "considered to be the standard of care by the surgical community." *See* Orthopedic Devices: Classification, Reclassification, and Codification of Pedicle Screw Spinal Systems, 60 Fed. Reg. 51946 (1995).

■ ¶ 23 Although we realize that the FDA generally does not regulate the prac-

---

**11.** We note, however, that the FDA at least minimally regulates the practice of medicine in several ways. For example, it requires that

a medical device be approved for sale for at least one use before a physician may use it for another "off-label" use. *See* 21 U.S.C. § 396.

tice of medicine and we accept that the use of bone screws in the spine may be the standard of care in the medical community, we cannot agree that such facts mandate the conclusion that a physician never need disclose the FDA's classification of bone screws to a patient to obtain the patient's informed consent. In an informed consent action, the relevant inquiry is whether a prudent patient would consider significant a particular fact, risk, complication, or alternative to a surgical procedure; if so, that information must be disclosed. *Gouse*, 532 Pa. at 202, 615 A.2d at 333. Whether the FDA regulates the practice of medicine is irrelevant to whether a prudent patient would consider significant that the FDA has not approved a device as safe and effective. Similarly, whether the use of a medical device is within the accepted medical standard of care is irrelevant to whether a prudent patient would want to know that the FDA has not approved the device as safe and effective.[12] Thus, the fact that a physician may use a medical device without interference from the FDA and in a non-negligent manner does not justify the conclusion of the courts in the coordinated litigations that the FDA's classification of bone screws need not be disclosed to obtain a patient's informed consent. The courts' partial summary judgment ruling, therefore, was based upon a faulty premise.

¶ 24 Beyond finding fault with the courts' premise, we also disagree with the courts' determination that the FDA's clas-

sification of a medical device is not a "risk" of a surgical procedure. A Class III classification by definition means that the FDA has determined that insufficient information exists to provide a reasonable assurance of the safety and effectiveness of a device. Thus, the FDA's Class III classification of bone screws constitutes a conclusion by the FDA that the screws have at least unknown characteristics. Clearly, unknown characteristics are risks. Moreover, even if the FDA's classification were not a "risk," it most certainly is a "fact" regarding a surgical procedure as stated in Pennsylvania's informed consent definition. *See Gouse*, 532 Pa. at 202, 615 A.2d at 333. Additionally, contrary to the holding of the courts in the coordinated litigations, we conclude that such risks or facts indeed "speak directly to the medical issues surrounding a particular surgery." What could be more germane to a surgical procedure than unknown characteristics of a medical device that is the *sine qua non* of that procedure? [13]

¶ 25 Indeed, we think that a prudent patient would want to know that the FDA has not approved a medical device as safe and effective prior to deciding whether to consent to a surgical procedure involving that device. A reasonable person faced with the surgical implantation of a medical device likely could presume that the FDA, the well-known federal agency charged with regulating the commercial distribution of medical devices, has tested and approved that device for safety and effec-

---

**12.** Because Pennsylvania's informed consent doctrine is not a negligence-based doctrine, negligence concepts should not be mixed into, and confused with, an informed consent analysis. *See, e.g., Kelly v. Methodist Hosp.*, 444 Pa.Super. 427, 664 A.2d 148, 149 (1995).

**13.** Amici supporting Temple and Physicians, relying only on selected portions of *Kaskie v. Wright*, 403 Pa.Super. 334, 589 A.2d 213 (1991), contend that the FDA's classification of bone screws is not "specifically germane to any operative procedure." *See* Brief of Amicus Curiae Pennsylvania Medical Society at 6. In *Kaskie*, our Court refused to expand the informed consent doctrine to include an ac-

tion based on a surgeon's failure to inform a patient that the surgeon was an alcoholic and not licensed to practice medicine, holding that such information was personal to the surgeon and "not specifically germane to surgical or operative treatment." 589 A.2d at 217. *Kaskie* is obviously distinguishable from this case. The personal characteristics of a particular physician are only tangential to a surgical procedure. The characteristics of a medical device that is the subject of a surgical procedure, by contrast, are intertwined inextricably with that procedure. Thus, *Kaskie* neither governs the issues in this case nor is contrary to our holding in any way.

tiveness. If told prior to surgery that a medical device had not been so approved by the FDA, a prudent patient might decline consent for such surgery, opting instead for a more conventional, FDA-approved mode of treatment. At the very least, a genuine issue of material fact exists as to whether a prudent patient would want to know prior to surgery that the FDA has not approved a medical device as safe and effective. That genuine factual issue must be presented to a jury to decide.

¶ 26 In their attempt to persuade us not to reach that result, Temple, Physicians, and their supporting Amici set forth several other arguments which we now take the opportunity to address. In one argument, they claim that the Class III classification of bone screws does not mean that the FDA has made a determination regarding the safety and effectiveness of the screws because that classification occurred by "automatic statutory default" after the FDA denied a manufacturer's request, pursuant to the Medical Device Amendments, to treat the screws as "substantially equivalent" to a device with a Class I or Class II classification. *See* 21 U.S.C. § 360c(c)(2)(C), (f). We agree that, under the Medical Device Amendments, the FDA automatically will classify a device in Class III after a manufacturer's request for a substantial equivalency determination has been denied or if the manufacturer otherwise cannot establish that the device should be classified in Class I or Class II. *Id.* Nevertheless, regardless of the means by which a device obtains its classification, the meaning of a Class III classification remains the same—the FDA has determined that insufficient information exists to provide reasonable assurance of the safety and effectiveness of the device. Thus, the means by which bone screws obtained their Class III classification has no effect upon our decision.

¶ 27 In another argument, Temple, Physicians, and their supporting Amici contend that physicians should not be required to inform patients of the Class III classification of bone screws because the FDA itself recognizes that bone screws should be classified in Class II and not in Class III, as stated in a 1995 Notice of Proposed Rulemaking in which the FDA proposed to reclassify bone screws used in the spine as Class II devices. *See* Orthopedic Devices: Classification, Reclassification, and Codification of Pedicle Screw Spinal Systems, 60 Fed.Reg. 51946. We disagree. A Notice of Proposed Rulemaking is a proposal only and is not a final regulation. The FDA apparently has issued no final regulation reclassifying bone screws used in the spine as a Class II device. Thus, regardless of the Notice, bone screws used in the spine remain a Class III device, which means that the FDA has determined that insufficient information exists to provide reasonable assurance of their safety and effectiveness. The Notice has no effect upon our decision.[14]

¶ 28 Finally, Amici supporting Temple and Physicians claim that physicians are not qualified to discuss FDA regulations with their patients and have no better understanding of those regulations than their patients have; thus, Amici contend, physicians should not be required to inform their patients of the FDA's classification of medical devices used in their patients' surgeries. We find it incredulous that physicians, with their years of education and training, would be incapable of reviewing the FDA's classification of a medical device and accurately relating that information to their patients. In this case, for example, Physicians could have explained to Branes Southard that, in the FDA's determination, insufficient information existed regarding the safety and effectiveness of bone screws when used in the

---

14. Moreover, the Notice had not been issued as of the time of Branes Southard's surgery in 1992; thus, it has no relevance to this case.

spine. Physicians could have supplemented that information with Physicians' opinion regarding the safety and effectiveness of bone screws based on personal experience or other medical literature. With that information, Branes Southard then could have made a fully informed choice about whether to undergo his surgery.

¶ 29 For the foregoing reasons, we conclude that the courts in the coordinated litigations erred by granting partial summary judgment in favor of all physicians regarding informed consent claims based on a failure to inform patients of the FDA classification of bone screws.[15] We reverse the Order granting partial summary judgment in favor of all physicians and, therefore, we vacate the judgment in favor of Physicians as to the informed consent claim based on a failure to inform Branes Southard of the FDA classification of bone screws. We remand for a new trial so that a jury can determine whether a prudent patient would consider significant that the FDA had determined that insufficient information exists to provide reasonable assurance of the safety and effectiveness of bone screws used in the spine.

¶ 30 In their second argument on appeal, Southards contend that the court in the state coordinated litigation erred by granting partial summary judgment in favor of all hospitals regarding all informed consent claims. Southards argue that a jury should have been permitted to decide whether Temple was obligated to obtain the informed consent of Branes Southard prior to his surgery.

¶ 31 Indeed, hospitals have no duty to a patient under Pennsylvania's informed consent doctrine. See Kelly, 664 A.2d at 150. However, if a hospital is a participant in an FDA-monitored clinical investigation and a patient is a subject of that investigation, the hospital is obligated to obtain the patient's informed consent pursuant to the federal regulations supporting the Medical Device Amendments. Friter v. Iolab Corp., 414 Pa.Super. 622, 607 A.2d 1111, 1113 (1992).

¶ 32 Southards concede that Temple is not liable under Pennsylvania's informed consent doctrine. Instead, Southards argue that an issue of material fact exists regarding whether an FDA-monitored clinical investigation involving bone screws used in the spine was ongoing at Temple at the time of Branes Southard's surgery, such that Temple was required to obtain Branes Southard's informed consent on the basis of the regulations enacted pursuant to the Medical Device Amendments. Southards base their argument on a definition of "clinical investigation" set forth in those regulations which includes investigations not yet approved by the FDA, but the results of which are intended to be submitted to the FDA to support an application for research or premarket approval ("unapproved investigations"). See 21 C.F.R. § 50.3. The regulations require investigators conducting such unapproved investigations to obtain, prior to surgery, the informed consent of the patients who are the subjects of such investigations. See id. § 50.20. Southards essentially claim that, because Temple allegedly was aware that investigations involving bone screws

15. We have reviewed all the cases cited by all the parties and supporting Amici in this case and we note that only two non-controlling authorities, reaching opposite conclusions, are directly on point on this issue. In Corrigan v. Methodist Hospital, 869 F.Supp. 1202, 1207 (E.D.Pa.1994), the United States District Court for the Eastern District of Pennsylvania concluded that there is a genuine issue of material fact as to whether the FDA's "investigational" classification of bone screws constitutes a risk of a surgical procedure which a physician should disclose to a patient under Pennsylvania's informed consent doctrine. In Klein v. Biscup, 109 Ohio App.3d 855, 865, 673 N.E.2d 225, 231 (1996), the Court of Appeals of Ohio determined that, as a matter of law, a patient need not be told of the FDA's classification of bone screws under Ohio's informed consent law. The court held that the off-label use of a medical device is not a risk of a therapeutic procedure, noting that the FDA does not regulate the "practice of medicine."

used in the spine had occurred at some unspecified time either at Temple or at other hospitals, an issue of fact exists regarding whether unapproved investigations were ongoing at Temple at the time of Branes Southard's surgery. According to Southards, if such unapproved investigations were ongoing at Temple when Branes Southard's surgery was performed, Temple would have been obligated to obtain Branes Southard's informed consent pursuant to federal regulations.

¶ 33 We conclude that Southards have set forth nothing more than mere conjecture and surmise to support their contention that an unapproved investigation was ongoing at Temple at the time of Branes Southard's surgery. Southards have failed to allege even that Branes Southard was the subject of such an unapproved investigation. Moreover, Southards have failed to allege that the results of the alleged unapproved investigation were intended to be submitted to the FDA to support an application for FDA approval. Thus, mindful of our standard of review of a challenge to a grant of summary judgment, we conclude, as a matter of law, that Temple had no duty to obtain Branes Southard's informed consent. We affirm the Order granting partial summary judgment in favor of all hospitals and, therefore, we affirm the judgment in favor of Temple as to both informed consent claims.

¶ 34 In their third argument on appeal, Southards contend that the trial court erred in prohibiting their cross-examination of Clements with the manufacturer's literature indicating the need for the bone screws' explantation.[16] Southards claim that they should have been permitted to engage in that cross-examination to refute Clements' testimony that the risk of explantation was so remote that it need not have been disclosed to Branes Southard to obtain his informed consent. Southards have requested a new trial on their informed consent claim against Physicians based on a failure to inform Branes Southard of the risk of the bone screws' explantation. The trial court concluded that the proposed cross-examination was not relevant to the informed consent claim because Physicians testified that they never read or relied upon the manufacturer's literature in their decision to use a particular medical device.

¶ 35 Decisions regarding the admissibility of evidence are within the discretion of the trial court and will be reversed on appeal only if the trial court abused its discretion or committed an error of law. *Rogers v. Johnson & Johnson Products, Inc.*, 401 Pa.Super. 430, 585 A.2d 1004, 1007 (1990). We will grant a request for a new trial based upon a trial court's evidentiary rulings only if those rulings not only are erroneous, but also are harmful to the complaining party. *Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa.Super. 94, 681 A.2d 201, 206 (1996). Evidence is relevant if it logically tends to establish a material fact in the case, tends to make the fact at issue more or less probable, or supports a reasonable inference or presumption about the existence of a material fact. *Kraus v. Taylor*, 710 A.2d 1142, 1143 (Pa.Super.1998).

¶ 36 In this case, the jury was presented with a claim alleging that the informed consent of Branes Southard was not obtained because he was not told, prior to his surgery, that the bone screws would need

---

**16.** The manufacturer's literature inserted into the packaging of the TSRH Spinal System Implants provided in pertinent part as follows:

> The TSRH Spinal System implants are temporary internal fixation devices.... After healing occurs, these devices serve no functional purposes and must be removed.... If the device is not removed following completion of its intended use, any of the following complications may occur: (1) corrosion ...; (2) migration of implant position ...; (3) ... postoperative trauma; (4) bending, loosening and/or breakage ...; (5) pain, discomfort, or abnormal sensations ...; (6) ... increased risk of infection; and (7) bone loss....

R.R. at 1296a–97a.

to be explanted. Evidence that the bone screws' manufacturer specified that the screws usually must be explanted, and that, if they are not, various complications could occur, certainly was relevant to the jury's decision regarding the materiality of the risk of explantation. *See Kraus*, 710 A.2d at 1143. Once Clements testified that, in his opinion, the risk of the bone screws' explantation was so remote that it was not necessary to disclose to Branes Southard, Southards should have been permitted to attempt to impeach that testimony with contrary evidence as stated in the manufacturer's literature.[17] Only then would the jury have been presented with all the relevant evidence on which to base its materiality determination.

¶ 37 We conclude, therefore, that the trial court erred by precluding Southards from cross-examining Clements regarding the content of the manufacturer's literature indicating the need for the bone screws' explantation. Moreover, we conclude that the trial court's error was harmful to Southards because it prevented them from presenting evidence to the jury crucial to their claim. Thus, we vacate the judgment in favor of Physicians and grant a new trial on Southards' informed consent claim based on a failure to inform Branes Southard of the risk of the bone screws' explantation.

¶ 38 In their remaining three issues on appeal, Southards claim that the trial court erred by refusing to instruct the jury as Southards had requested. The first two of those issues, however, concern the trial court's jury charge on informed consent. Because we have granted Southards a new trial on their informed consent claims, we

need not address either of those issues. We address only Southards' third jury charge challenge, concerning the trial court's instructions on Southards' negligence claims.

¶ 39 We review a challenge to a jury instruction to determine if the trial court abused its discretion or committed an error of law. *Boutte v. Seitchik*, 719 A.2d 319, 324 (Pa.Super.1998). We will not grant a new trial because of an erroneous jury instruction unless the jury charge in its entirety was unclear, inadequate, or tended to mislead or confuse the jury. *Id.* Even if a trial court has refused to give a proposed instruction that contained a correct statement of the law, we will not grant a new trial on the basis thereof if the substance of that instruction was covered by the trial court's charge as a whole. *Santarlas v. Leaseway Motorcar Transp. Co.*, 456 Pa.Super. 34, 689 A.2d 311, 312 (1997).

¶ 40 Southards' contend that the trial court erred by refusing to charge the jury with one of their proposed instructions regarding the negligence claims against Temple and Physicians. Specifically, relying on *Green v. Dolsky*, 546 Pa. 400, 685 A.2d 110 (1996), Southards claim that the trial court erred by refusing to give a requested instruction essentially stating that Physicians, by failing to read the manufacturer's literature, could have breached their duty of care to educate themselves as to the proper use of the bone screws or to investigate the screws' side effects.[18] They contend that the trial court's error entitles them to a new trial as to their negligence claims.

---

17. We note that, because the trial court prohibited the cross-examination of Clements based on a relevancy determination, it thereby precluded Southards from authenticating the manufacturer's literature. *See McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436, 447 (1987).

18. Southards' requested instruction provides in pertinent part as follows:

> Dr. Clements and/or Dr. Young may be found liable if you find that they failed to educate themselves as to the proper use of the TSRH spinal fixation system that they implanted into Branes Southard's spine. Dr. Clements and/or Dr. Young may also be found liable if you find that they did not adequately investigate the side effects of the product, including specifically the potential risk of explant.
> R.R. at 146a.

¶ 41 We disagree. Even if Southard's instruction set forth a correct statement of the law,[19] the trial court did not err by refusing to give that instruction because its charge as a whole covered the substance of that instruction. *See Santarlas*, 689 A.2d at 312. We have reviewed the trial court's jury instructions regarding Southards' negligence claims in their entirety and conclude that those instructions clearly and adequately stated the law of negligence. Southards therefore are not entitled to a new trial on their negligence claims.

¶ 42 To summarize, we reverse the Order granting partial summary judgment in favor of all physicians and therefore vacate the judgment in favor of Physicians regarding the informed consent claim based on a failure to disclose the FDA classification of bone screws used in the spine. We also vacate the judgment in favor of Physicians regarding the informed consent claim based on a failure to disclose the risk of explantation. We therefore remand for a new trial on the two informed consent claims against Physicians.

¶ 43 We affirm the Order granting partial summary judgment in favor of all hospitals and therefore affirm the judgment in favor of Temple regarding both informed consent claims. We also affirm the judgment in favor of Temple and Physicians with respect to the negligence claims.

¶ 44 Judgment vacated in part and affirmed in part; case remanded for a new trial in accordance with this Opinion; jurisdiction relinquished.

---

**19.** Southards' reliance on *Green v. Dolsky* as a basis for their proposed instruction is misplaced. Contrary to Southards' assertion, the Court, in *Green v. Dolsky*, did not hold that a physician has an affirmative duty to educate himself as to the proper use of a medical device or to investigate a device's side effects. Rather, it merely implied in *dicta* that such duties exist and, moreover, did so only in the context of a preemption analysis. 546 Pa. at 415–16, 685 A.2d at 118 (commenting that, because the Medical Device Amendments specifically regulate the content of a medical device manufacturer's literature, including the risks stated therein, a physician would not be liable for a state law negligence claim asserting a failure to educate as to the proper use of a medical device if the physician had read the FDA-approved manufacturer's literature).