685 A.2d 110

**Irene M. GREEN and Martin Green, Appellants,**

v.

**Richard L. DOLSKY, M.D. and Collagen Corporation, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 24, 1995.

Decided Nov. 22, 1996.

402

Lindley Cowperthwait, Norristown, PA, Michael M. Essymer, and Susan A. Allinger, Clinard J. Hanby, Houston, TX, for appellants.

Allison M. Zieve, Washington, DC, for Pub. Citizen.

Terry S. Hyman, Harrisburg, PA, for amicus curiae Trial Lawyers Ass'n.

Joe W. Redden, Houston, TX, Regina M. Foley, Washington, DC, Reeder R. Fox, Philadelphia, PA, for appellees.

Robert N. Weiner, Washington, DC, for Prod. Liability.

James M. Beck, Philadelphia, PA, for Medical Device Ass'n

Donald R. Stone, Washington, DC, for amicus curiae Medical Device Manf. Ass'n.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

FLAHERTY, Chief Justice.

The sole question presented in this case is whether section 360k(a) of the Medical Device Amendments (MDA) to the Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 360k(a) (1988) preempts state causes of action sounding in tort.[1]

---

1.  Section 360k(a) of the MDA to the FDCA provides:

    [N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement (1) which is different from, or in addition to, any requirement applicable under this Act to the device and

The relevant facts are that Irene Green allegedly developed an autoimmune disorder after receiving an injection of Zyderm Collagen Implant (Zyderm) from her physician, Dr. Richard Dolsky. Zyderm is manufactured by Collagen Corporation, and is a Class III medical device subject to regulation under the MDA before it may be sold to the public. 21 U.S.C. § 360c(a)(1)(C). Zyderm has been on the market since 1981, when FDA approved Collagen's application to sell it. FDA reaffirmed that approval in 1992.

In 1992, Mrs. Green and her husband sued Dr. Dolsky on the theories of negligence, failure to warn and failure to obtain informed consent. She and her husband also sued Collagen on the theories of negligence, strict liability, and breach of warranty. Green's husband sought damages from both defendants for loss of consortium. The trial court held that the MDA preempted these claims and granted summary judgment for the defendants. Superior Court affirmed and we granted Green's petition for allowance of appeal.

## THE REGULATORY SCHEME

The United States Court of Appeals for the Eleventh Circuit recently provided the following overview of the history and purpose of the regulatory scheme of which the MDA are a part:

The market for medical devices was largely unregulated at the national level until the MDA's passage in 1976. With the MDA, Congress gave the federal Food and Drug Administration (FDA) comprehensive jurisdiction over all "devices intended for human use." 21 U.S.C.A. § 360c(a)(1). The text of the MDA reveals two competing congressional purposes relevant to this case: (1) the MDA protects the public from unnecessary illness or injury by subjecting medical devices to a regulatory scheme designed to ensure that the devices are safe and effective, *see, e.g.,* 21 U.S.C.A.

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

21 U.S.C. § 360k(a).

§§ 360c(a)(1)(A)(i); 360c(a)(1)(B); 360e(d)(2); and (2) the MDA protects the public by encouraging the development and marketing of medical devices by crafting a nationally uniform regulatory scheme that prevents overregulation and thus ensures that development can be economically feasible. . . .

*Lohr v. Medtronic, Inc.,* 56 F.3d 1335, 1339 (11th Cir.1995)(footnote omitted).

■ The MDA were enacted in response to public dissatisfaction following injuries in the 1960's and 1970's by women using the Dalkon Shield, a contraceptive device. Although the Dalkon Shield was marketed as a safe and effective contraceptive device, its use resulted in a high number of unintended pregnancies, infections, and even in a few cases, death. *Medtronic v. Lohr,* 518 U.S. ——, ——, 116 S.Ct. 2240, 2246, 135 L.Ed.2d 700 (1996). It was apparent that the pace of development in the medical device industry exceeded any existing governmental controls, and the MDA, which give the FDA broad powers to regulate medical devices, were enacted as a remedy. See *Kennedy v. Collagen Corp.,* 67 F.3d 1453 (9th Cir., 1995).

The MDA classifies medical devices as Class I, II or III, depending upon their potential danger to the public. Class I devices pose little or no threat to health and safety and are subject to only general controls over manufacturing. 21 U.S.C. § 360c(a)(1)(A). Examples of Class I devices are elastic bandages, tongue depressors and bed pans. Class II devices require special controls, such as performance standards, postmarket surveillance, patient registries and guidelines for use of the devices. 21 U.S.C. § 360c(a)(1)(B). Examples of Class II devices are oxygen masks, tampons, syringes, hearing aids, and condoms. Class III devices are "for use in supporting or sustaining human life or ... of substantial importance in preventing impairment of human health" or "present a potential unreasonable risk of illness of injury." 21 U.S.C § 360c(a)(1)(C). Class III devices include replacement joints, pacemakers and heart valves. Thus, Class III devices are the most heavily regulated. In-

cluded in this class is the Zyderm which was implanted in Mrs. Green.

■ There are two methods of securing approval to sell a Class III device. The first is the premarket approval process, in which the manufacturer must submit a detailed premarket approval application to the FDA that presents all available information concerning investigations of the device's safety and effectiveness; detailed information regarding its design, components, ingredients, properties, and principles of its operation; a full description of manufacturing methods and controls. 21 U.S.C. § 360e(c)(1). This premarket application must be approved before the device can be sold. 21 U.S.C. § 360c(a)(1)(C).

■ After premarket approval has been given, the FDA may, under certain conditions, withdraw approval, and it also has other powers:

> The FDA has limited remedial power to require the manufacturer to notify the public of newly discovered risks; to order repair, replacement or refund of the purchase price of a device; and to order recall of a device. [21 U.S.C.] at § 360h. Additionally, a device manufacturer is subject to criminal penalties for certain prohibited acts and may be assessed civil penalties by the FDA. [21 U.S.C.] at §§ 331, 333. It is generally understood ... that there is no private right of action under the Food, Drug and Cosmetics Act. See Talbott v. C.R. Bard, Inc., 865 F.Supp. 37, 45 (D.Mass. 1994) ... see also King v. Collagen Corp., 983 F.2d 1130, 1140 (1st Cir.), cert den 510 U.S. 824, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993)(no implied right of action).

Mears v. Marshall and Collagen Corp., 138 Ore App. 476, 909 P.2d 212 (1996).

The second method of approval for the sale of a Class III Medical Device is to establish that it is substantially equivalent to a device that is already on the market. See 21 U.S.C. § 360e(b)(1)(A). If this can be established, the premarket approval process, which is somewhat lengthy, can be avoided.

The rationale for this exception to the premarket approval process is explained by the *Lohr* Court:

Not all, nor even most, Class III devices on the market today have received premarket approval because of two important exceptions to the PMA requirement. First, Congress realized that existing medical devices could not be withdrawn from the market while the FDA completed its PMA analysis for those devices. The statute therefore includes a "grandfathering" provision which allows pre–1976 devices to remain on the market without FDA approval until such time as the FDA initiates and completes the requisite PMA.... Second, to prevent manufacturers of grandfathered devices from monopolizing the market while new devices clear the PMA hurdle, and to ensure that improvements to existing devices can be rapidly introduced into the market, the Act also permits devices that are "substantially equivalent" to pre-existing devices to avoid the PMA process.

*Medtronic, Inc. v. Lohr*, 518 U.S. ——, ——, 116 S.Ct. 2240, 2247, 135 L.Ed.2d 700.

## PREEMPTION

The United States Supreme Court has discussed preemption as follows:

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art VI, cl 2. Thus, since our decision in *McCulloch v. Maryland*, 4 Wheat. 316, 427, 4 L.Ed. 579 (1819), it has been settled that state law that conflicts with federal law is "without effect." ... Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146 [1152], 91 L.Ed. 1447 (1947). Accordingly, " '[t]he purpose

of Congress is the ultimate touchstone' " of preemption analysis.

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992)(Mr. Justice Stevens, joined in this part of the opinion by Mr. Chief Justice Rehnquist, Messrs. Justice White, Blackmun, Kennedy, and Souter and Madame Justice O'Connor.) Accord, *Medtronic v. Lohr*, 518 U.S. at ——–——, 116 S.Ct. at 2250–51.

## DISCUSSION

With this background, we now turn to a discussion of whether the MDA preempt state law causes of action for injuries allegedly received because of the use of a medical device. We note initially that the question arises because, as mentioned earlier, there is no private right of action under the MDA, and in the absence of state law claims, a party injured by a medical device would have no cause of action against any person or entity.

Very recently the Supreme Court of the United States has resolved at least some of the questions involved in this case. In *Medtronic v. Lohr*, 518 U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Lohrs brought a state court action in negligence and strict liability, claiming that a pacemaker manufactured by Medtronic had failed, injuring Mrs. Lohr. The pacemaker was a Class III device under the MDA, and it had been approved for sale under that portion of the MDA which allowed for sale of the device without premarket approval if the device was "substantially equivalent" to devices which were already on the market. See 21 U.S.C. § 360e(b)(1)(A). This method of approval is known as the § 510(k) process after the number of the section in the original act.[2]

Mr. Justice Stevens, joined by Messrs. Justice Kennedy, Souter and Ginsburg, announced the judgment of the Court in *Lohr*. Mr. Justice Breyer joined the opinion except for two

2. In 1990, a committee of the House of Representatives reported that 80% of new Class III medical devices were introduced to the market by way of the § 510(k) process. *Lohr* at ——–——, 116 S.Ct. at 2247–48,

sections and concurred in the judgment. The majority held that Lohrs' design claim was not preempted, for the device had been approved for sale under the § 510(k) provision, which meant that the FDA had not examined the merits or safety of this particular device, but had decided only that it was substantially equivalent to devices already on the market. 518 U.S. at ——, 116 S.Ct. at 2254–55.

Further, the Court held that state claims alleging the manufacturer violated FDA regulations can be maintained, and that even if state causes of action require the proof of negligence or the creation of an unreasonable hazard, such additional elements make the claim narrower, not broader, and thus, are not to be regarded as additional or different "requirements." 518 U.S. at ——, 116 S.Ct. at 2255.[3]

Additionally, the Court concluded that the Lohr's manufacturing and labeling claims are not preempted by the Act, for the regulations in *Lohr* concerned device regulation generally, and not a specific device or field of device regulation which might be contradicted by state requirements. The Court pointed out that whether manufacturing and labeling claims are preempted will "require a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement...." 518 U.S. at ——, 116 S.Ct. at 2257–58.

Four justices, (Madame Justice O'Connor, joined by the Chief Justice, and Messrs. Justice Scalia and Thomas) concurring in part and dissenting in part, agreed with the majority that Lohrs' defective design claim was not preempted because the § 510(k) process merely confirms that pre–1976 and post–1976 devices are equivalent; it does not impose "requirements." These justices also agreed that the Lohr's claims were not preempted insofar as they seek to enforce

---

**3.** The Court stated:

> The regulations promulgated by the FDA expressly support the conclusion that § 360(k) "does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act." 21 CFR § 808.1(d)(2) (1995).

Op. at ——, 116 S.Ct. at 2256.

FDA requirements, for such claims do not impose requirements that are different from or in addition to requirements under federal law.

The four justices dissented, however, to the majority's view that § 360k does not preempt state common law actions. In the view of the dissenters, if the common law action imposed any requirement different from FDA requirements, it should be preempted. The dissenters also disagreed that the Lohrs' manufacturing and labeling claims would survive preemption, for the FDA's good manufacturing practice regulations, in the view of the dissent, imposed comprehensive requirements which were different from the negligence standard which would be alleged in common law claims regarding manufacturing. Similarly, the dissenters would disallow the failure to warn claim because they regarded it as preempted by the federal labeling requirements.

Mr. Justice Breyer concurred in part and concurred in the judgment. Justice Breyer would hold that the MDA preempt a state law tort suit when the standard of care or behavior imposed by the lawsuit would be preempted if it were a state regulation instead of an element in a common law cause of action. He also observed that ordinary principles of preemption should control: viz., the state requirements actually conflict with the federal requirements, or the scheme of federal regulation is so pervasive as to compel the conclusion that there is no room for the states to supplement it. 518 U.S. at ——, 116 S.Ct. at 2247–48 (Concurring Op.).

Although *Lohr* answers some questions raised in this case, it is not wholly applicable, for in *Lohr* the § 510(k) process was utilized to market the device, and in the present case, the premarket approval process was utilized. Nonetheless, some guidance is available. First, *Lohr* teaches that state claims which allege that FDA requirements have not been met are cognizable. Second, if a state cause of action requires proof of additional elements such as negligence or creation of a hazard, these elements are not additional "requirements" within the meaning of § 360(k). Third, manufac-

turing and labeling claims will not be preempted so long as the federal requirements do not relate to the specific device at issue.

In the case at bar, the FDA approved Zyderm for sale in the form submitted to the agency, and required, as a condition of its approval, that any changes that might adversely affect the safety or effectiveness of the device must first receive agency approval, including but not limited to the following:

(1) New indications for use; (2) labeling changes; (3) changes in manufacturing facilities, methods or quality control procedures; (4) changes in sterilization procedures; (5) changes in packaging; and (5) changes in performance or design specifications.

R.R. 452b–456b. 21 C.F.R. § 808.1(d) provides:

State or local requirements are preempted only where the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act.

Pursuant to these considerations, the following negligence claims with respect to the Collagen Corporation are preempted, since the FDA preempted the field of regulation by issuing specific regulations with respect to the claims asserted:

a. negligent development of the product [4]

b. failing to warn plaintiff [5]

d. failing to give adequate warning to physicians [6]

n. failing to properly label the product

These claims are impermissible because they attempt to substitute a reasonableness analysis characteristic of negligence

**4.** The claims stated in the complaint are not repeated here verbatim, but are stated in abbreviated form. The letters identifying each claim correspond to the letters used in the First Amended Complaint.

**5.** As indicated above, the FDA approved the labeling and package inserts which would accompany the product.

**6.** The FDA approved the Physician Package Insert, which was, in effect, instruction to physicians for use of the product. Letter of February 3, 1982 from Debera Brown to Thomas J. Callahan of the FDA.

claims for the judgment of the FDA in approving the development and distribution of this particular product in the course of its premarket approval process.

The following negligence claims are so general as to preclude our determination as to preemption:

p.   being negligent as a matter of law.

q.   being otherwise negligent, careless or reckless

r.   violating the statutes, laws or regulations of the United States and Pennsylvania.

The following negligence claims, which, in essence, mirror FDA requirements, are not preempted:

c.   negligent distribution of Zyderm in commerce, knowing Zyderm to be defective and dangerous.[7]

e.   allowing Zyderm to be sold in the face of known consequences

f.   failing to test adequately, in the face of known consequences.

g.   failing to provide FDA with all data

h.   failing to provide FDA with known product risks and reactions

i.   failing to adequately study adverse reactions, in the face of known consequences.

j.   allowing Zyderm to be sold while knowing of dangerous propensities

---

7.   Several of Green's negligence allegations include the phrase "known or knowable." We approve the cause of action insofar as it concerns that which was known, but not as to that which was knowable. If the manufacturer sold, distributed, failed to test, failed to study adverse reactions of the product, *knowing* that the product was defective, the allegations are, in essence, that the manufacturer fraudulently completed the premarket approval process. Such claims are cognizable for they mirror FDA prohibitions against fraud.

On the other hand, insofar as Green alleges that certain things were "knowable," such claims are preempted by the premarket approval process. The FDA preempted the field of that which was knowable by determining, after reviewing the premarket approval materials for Zyderm, that the information submitted was sufficient. The plaintiff may not inquire further as to what should have been known, unless the allegation is that the manufacturer was engaged in fraud or deliberate obfuscation in submitting its premarket approval application.

k. providing FDA with false, fraudulent, incomplete testing results

l. providing FDA with false, fraudulent, incomplete adverse reaction or injury information

m. failing to withdraw Zyderm from the market under the circumstances

o. failing to properly monitor and identify patients who had been injected with Zyderm after learning of adverse consequences.[8]

■ Green's strict liability claim is precluded by § 360k. The essence of the strict liability claim is that the manufacturer placed a dangerous and defective device into commerce, the product was administered in unchanged condition, and the product caused the injuries alleged. However, this product was approved for sale after undergoing the premarket approval process. In other words, the FDA determined that the product was neither dangerous nor defective. To allow a strict liability claim for a product specifically approved by the FDA would be to impose "requirements" which are different from those of the FDA and which affect the safety of the device, in violation of § 360k.

■ With respect to the breach of warranty claim that "Zyderm was safe, fit and proper for cosmetic use for injection into the body," the claim must fail for the FDA has restricted the labeling to be used in the sale of this product.

■ With respect to the claims against Dr. Dolsky, the claim that Dolsky was negligent in failing to educate himself and his staff as to the proper means to administer Zyderm; that he did not adequately investigate the side effects of the product; that he failed to maintain proper medical records

8. The July 22, 1981 letter from the Food and Drug Administration approving the premarket approval application for Zyderm contains a requirement for post-approval studies of patients who have received Zyderm treatment. (Def Ex. 4). This claim is permitted insofar as it does not exceed the requirements stated by the FDA. See also, "Conditions of Approval," Adverse Reaction and Device Defect Reporting, R.R. 455b–456b.

under the circumstances are all permissible medical malpractice claims.

Likewise, the failure to warn and the failure to obtain informed consent claims are permissible medical malpractice claims. All of the malpractice claims, of course, are circumscribed by the MDA. If Dr. Dolsky read the materials required and/or approved by the FDA for circulation to physicians, he will not be held liable for failure to educate himself or to warn where he followed the instructions contained therein and made known to the patient the risks which were stated in the FDA materials.

Reversed and remanded for further proceedings consistent with this opinion.

NIX, former C.J., and MONTEMURO, J., sitting at the time of argument, did not participate in the decision of this case.

CAPPY, J., files a concurring opinion which is joined by CASTILLE, J.

CAPPY, Justice, concurring.

I am in accord with the result reached by the majority. I write separately, however, to express my disagreement with the majority's statement that "[a]ll of the [medical] malpractice claims, of course, are circumscribed by the MDA." Majority op. at 416.

The MDA preempts a state requirement which "(1) is different from, or in addition to, any requirement applicable under this chapter to the device, and (2) which relates to the safety or effectiveness of the device...." 21 U.S.C. § 360k(a). The United States Supreme Court has held that a statute which preempts "state requirements" could also preempt some common-law tort actions. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *Medtronic v. Lohr*, —— U.S. ——, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).

Yet, for a common-law tort action to be preempted by the MDA, it must impose requirements *on the device.* *See* 21 U.S.C. § 360(k)(a). Medical malpractice law simply does not place requirements on a device. Such law establishes requirements for the professional standard of care required of our medical community. Even where the allegation is that a physician committed malpractice while employing a medical device in his treatment, the issue to be resolved—and the law created by that resolution—concerns whether the physician's conduct was reasonable. Resolution of that issue does not create standards concerning the safety and efficaciousness of the product in question.

For the foregoing reasons, I am unable to join that portion of the majority's opinion which concludes that the preemption provision of the MDA applies to medical malpractice claims.

CASTILLE, J., joins this concurring opinion.